Copy  12

# JUDGE'S COPY



FILED

APR 0 9 2001

PER ___
HARRISBURG, PA.    DEPUTY CLERK

*Exhibit C*

Transcribed by DEPOSITION SERVICES, INC. At Rockville, Maryland


Official Interpreter:


Language:


Appearances:

        For the Immigration and         For the Respondent:
        Naturalization Service:

        Pamela Ransome, Esquire          Pro se

14          Q.   All right, Mr. Perez, we do have an interpreter

15   standing by here.  Would you wish to speak in English or in

16   Spanish?

17          A.   No, I speak English, Your Honor.

18          Q.   All right, we'll just have her stand by, then, in

19   case there's any confusion.  Now, Mr. Perez, I received your

20   documentation, which I've read --

21          A.   Yes, Your Honor.

22          Q.   Which I've read through, and today we're going to

23   discuss your case.

24          A.   Your Honor, could I bring something to the

25   attention of the Court, please?

cls

1          Q.   Yes.

2          A.   (Indiscernible.)  Yes, when I was going through

3    the asylum claim, I noticed that I made a mistake, and I want to,

4    I would submit an affidavit of correction.  On page 6, where it

5    says if I used any aliases before.

6          Q.   All right, let me find that.

7    MS. RANSOME TO JUDGE

8          Q.   Your Honor, is that page 6 of his actual I-589 or

9    of his statement?

10   JUDGE TO MR. PEREZ

11         Q.   Page 6 of the asylum --

12         A.   No, no, on the first, on the first page, I think

13   in box number 6 was (indiscernible) aliases.

14         Q.   Okay, yes, number 6.

15         A.   Right.  I, this has, you know, been so long I

16   forgot I used an alias a long time, and I want to submit a

17   correction affidavit.

18         Q.   Well, why don't you just tell us what it is?

19         A.   Well, I used, I once used the name of Carlos

20   Rossi, R-O-S-S-I.

21         Q.   All right.

22         A.   Another thing, Your Honor, is that I spoke to my

23   family on Monday night, and they brought to the attention that

24   they were supposed to come today and talk on my behalf for my

25   claim, and for some reasons, my grandmother couldn't come.  The

A 31 221 000                    14                   August 2, 2000

cls

1    person that was driving her over could not either.  And I was

2    hoping that maybe if you could give me an extension and so they'd

3    be able to come to the court on my behalf.  I feel that their

4    testimony is important to my claim.

5         Q.    Well, sir, let me explain something to you.  And

6    I've spent a good amount of time going through all of your

7    information here, and frankly, the only claim which you are

8    entitled to make under the law is under the Convention Against

9    Torture, and that --

10        A.    That's right, Your Honor.

11        Q.    And that is the claim which says that if you were

12   sent back to Colombia that a governmental agent or agency would

13   have an interest in detaining you and torturing you.  Now,

14   there's a lot of material in here which I've read which goes to

15   other issues of more of a humanitarian nature and the situation

16   with your grandmother and this kind of thing, but frankly I don't

17   see --

18        A.    Right.

19        Q.    I don't see how that relates to the actual issue,

20   I don't know how your grandmother is going to shed any light on

21   whether an agency in Colombia would want to detain you and

22   torture you.

23        A.    Well, Your Honor, it's not, it's not especially

24   the agencies, a group, a group down there, I mean, this is

25   something that applied to my mom's situation and her involvement

A 31 221 000                    15                    August 2, 2000

cls

1    with some groups down there got me in the situation I am right

2    now, and that caused a cousin of mine to be kidnapped in New York

3    a while back, and there was an attempt on my life in Miami, and,

4    you know, my grandmother and the people in my house received some

5    threats before, and I believe that their testimony is important

6    to my claim.

7         Q.   All right, well, we're going to have you tell us

8    your story first today, and then we'll see how far we get.

9    JUDGE FOR THE RECORD

10        Now, just to set the stage here, we've done a pleading

11   in the past.  The Notice to Appear, Exhibit 1, the allegations

12   have been admitted, and the Court sustains the charge of

13   removability as an aggravated felon, in that the respondent has

14   an conviction for conspiracy to launder money, and the

15   Government's submission of evidence at Exhibit 2, which includes

16   the record of conviction and a superseding indictment.  The

17   indictment clearly establishes to the Court's satisfaction that

18   there was a very substantial amount of money involved.  And the

19   indictment is a document which is admissible into the record

20   under Board precedent.  And furthermore, the respondent has been

21   sentenced to a period of 60 months in jail, and therefore, given

22   that he is convicted of an aggravated felony and sentenced to a

23   period of at least five years in jail, the respondent is not

24   eligible for consideration of either political asylum under 208

25   of the Act or withholding of removal under Section 241(b) of the

A 31 221 000                16              August 2, 2000

cls

1    Act, and the respondent has evidenced a fear of return to

2    Colombia, and he is therefore entitled to be considered under the

3    Convention Against Torture, Article III, and that's what we will

4    consider today.

5    JUDGE TO MR. PEREZ

6            Q.    Now, first of all, Mr. Perez, I'm going to swear

7    you in.  Please raise your right hand.  Do you swear the

8    testimony you give today will be the whole truth?

9            A.    Yes, Your Honor.

10           Q.    All right.

11           A.    Now, you submitted the application for asylum, the

12   I-589, and we're going to ask you some questions about that in a

13   minute.  And there's also attached an affidavit.  Now, sir, to

14   the best of your knowledge, is everything in the I-589 and the

15   affidavit true?

16           Q.    Yes, Your Honor.

17           A.    All right.  And then we also received, the Court

18   received it on May the 4th of this year, numerous documents which

19   include what is called a petition for Convention Against Torture

20   protection.  And then there is another affidavit, called

21   affidavit in support of INS motion to withhold deportation, and

22   then there is an exhibit, and then numerous documents, newspaper

23   articles and this kind of thing, about the situation in Colombia,

24   and a report from the United Nations on the human rights, a

25   report from the U.N. High Commissioner for Human Rights on the

A 31 221 000                    17                    August 2, 2000

cls

1      office in Colombia.  And then attached also are numerous

2      certificates in the respondent's name, different programs that he

3      has completed while he has been serving his prison sentence.

4      JUDGE TO MR. PEREZ

5              Q.   Is that correct, Mr. Perez?

6              A.   Yes, Your Honor.

7      JUDGE TO MS. RANSOME

8              Q.   All right, now, Ms. Ransome, are you in receipt of

9      that document?

10             A.   Yes, Your Honor, I am, all of the documents that

11     the Court has mentioned.

12     JUDGE FOR THE RECORD

13             All right, the I-589 will be marked as Exhibit 3, and

14     then the respondent's group exhibit received on May the 4th will

15     be Group Exhibit 4.

16     JUDGE TO MR. PEREZ

17             Q.   Now, Mr. Perez, is there, are there any other

18     submissions in your case that you wish to bring to my attention?

19             A.   No, Your Honor.

20     JUDGE TO MS. RANSOME

21             Q.   And does the Government have any submissions in

22     this case?

23             A.   Your Honor, the Government does have the Country

24     Reports on Human Rights Practices for Colombia for 1999, which

25     was created on February 25th, 2000, if the Court would like to

A 31 221 000                    18                    August 2, 2000

cls

1    make it part of the record.  Also, Your Honor, I hesitate to

2    submit it to the Court, because I believe it's untimely, but

3    there is a Profile that's available if the Court wishes to

4    consider.  It's from June 1997.

5            Q.    All right, that --

6            A.    (indiscernible) going to be the best information

7    at this point.

8            Q.    Yes, I don't think that I need that.

9    JUDGE TO MR. PEREZ

10           Q.    All right, now, Mr. Perez, I'm being handed at

11   this moment from the INS attorney the State Department Country

12   Report on Human Rights Practices in Colombia for the year 1999,

13   published this year, and first of all, would you have objection

14   to me making this part of your file?

15           A.    Well, I haven't seen that, Your Honor, so I

16   wouldn't know how to answer right now.

17           Q.    All right, so we're going to have to send you

18   this, a copy of this, and then you can --

19           A.    Thank you.

20           Q.    You can respond after you've seen it.

21   JUDGE FOR THE RECORD

22           I'll mark it as Exhibit 5.

23   JUDGE TO MR. PEREZ

24           Q.    All right, now, I'm just going to review some of

25   the factual information, and then I'll ask you to recount your

A 31 221 000                          19                    August 2, 2000

cls

1    story a little bit, all right?

2           A.   Yes, Your Honor.

3           Q.   Also, Mr. Perez, what day are you supposed to be

4    released?

5           A.   August 24th, Your Honor.  2000.

6           Q.   All right.  All right, sir, what is your date of

7    birth?

8           A.   April 5th, 1966.

9           Q.   And where were you born?

10          A.   Bogota, Colombia.

11          Q.   And you came to the United States when you were

12   six years old?

13          A.   Yes, sir.

14          Q.   Do you have any other relatives, any close

15   relatives still living in Colombia?

16          A.   No, Your Honor.

17          Q.   Now, where were you living before your latest

18   conviction?

19          A.   In New York.

20          Q.   Have you ever been married?

21          A.   No, Your Honor.

22          Q.   And any children?

23          A.   No, Your Honor.

24          Q.   How high did you go in school?

25          A.   I went to the, I believe, eighth grade, and then I

cls

1    got my GED.

2              Q.    When did you receive GED?

3              A.    My GED, I believe that was in like eighty, I'm not

4    sure, Your Honor.  Hold on.  '85, '86, I believe.

5              Q.    All right.  And then I saw that you had received

6    flight training.

7              A.    Yes, Your Honor, I took some private pilot

8    training in Long Island.

9              Q.    Did you ever receive your pilot's license?

10             A.    I got my private.  My private certificate, yes,

11   Your Honor.

12             Q.    And was that in 1983?

13             A.    Yeah, between '82 and '83, Your Honor.

14             Q.    All right, why don't you now, I'm going to ask you

15   to relate the events which led up to your conviction, and if you

16   get too long-winded, I'll ask you to be more brief.  But why

17   don't you give us --

18             A.    All right, Your Honor.

19             Q.    Give us the background now.

20             A.    Well, Your Honor, back in 1990, I was living,

21   until 1990, I was living with my grandmother in New York.  That

22   same year, my mom was released from Dublin, California, out in

23   San Francisco.  She decided to reside down there and she had

24   called my grandmother and asked us, asked my brother and myself

25   to move to L.A. so that she could be able to have an immigration

cls

```
 1    hearing so that she could stay in this country.  That's the first
 2    time I ever went and tried to live with my mother, and that first
 3    year there I decided to come back to New York.  I mean, she stood
 4    there with my brother.  Eventually she got arrested on her, on
 5    some other involvement she got into.  I went down, she called
 6    back, and I went to help her get an attorney, and she had asked
 7    me to do some certain stuff.  Some I denied, another I tried to
 8    help her out, which got me involved in the conspiracy to launder
 9    money.
10            Q.   All right, so now you're going a little too fast.
11    First of all, so your mother was serving time on a different
12    offense in California?
13            A.   I believe so, Your Honor.
14            Q.   Do you know what it was, what the offense was?
15            A.   I think it was a violation, I'm not sure.  I never
16    lived with her.
17            Q.   All right, so then she asked you to move out to
18    help her with her deportation matter?
19            A.   Yes, Your Honor, she wanted to try to stay in this
20    country.
21            Q.   And what about your brother?  Did you mention your
22    brother?
23            A.   My brother, he went along with us.
24            Q.   Okay, and then what did she ask you to do?
25            A.   Well, eventually when we stayed there for a while,
```

cls

1    I couldn't live with her, so I had to move back to New York.  In

2    that period, I found again that she had gotten in trouble with

3    the law.  I went back with my grandmother and my aunt, and we

4    found out that she was again indicted on some other related

5    activities and she needed some help in getting an attorney, and

6    she asked me to get some money for her.  I didn't know this was

7    going to be an illegal activity, and I spoke to certain people,

8    and this is how I got into my case now.

9          Q.   All right, so you went back out with your

10   grandmother and --

11          A.   My aunt and my brother.

12          Q.   And now, so what did she ask you to do to raise

13   the money?

14          A.   Well, no, to talk to certain people.  She gave me

15   a number, she gave me two or three different numbers, and I

16   talked to certain people that I never met before either.  I tried

17   to do it.

18          Q.   Well, what were you supposed to talk to them

19   about?

20          A.   Well, they order money and they're showing me to

21   collect some money for her.  Said there was money that was owed

22   to her, and she told me that she needed that money to get an

23   attorney and to fix, you know, her situation.

24          Q.   All right, so you agreed to help, and how many

25   people did you talk to about that?

cls

```
 1              A.    I spoke to two different people, Your Honor.

 2              Q.    And what happened?

 3              A.    One of them said he didn't know me and he did not

 4    know if I was my mom's son, and he denied to give me any money.

 5    And the other one that said that he would consider giving me some

 6    money that he owed her, but he had to speak to her first.

 7              Q.    All right, and did he eventually give you some

 8    money.

 9              A.    He gave me some money for her attorney, yes, Your

10    Honor.

11              Q.    How much did he give you?

12              A.    He gave me like, I believe it was $8,000.

13              Q.    And did you speak to her attorney?

14              A.    Yes, Your Honor.

15              Q.    And what happened after that?

16              A.    After that, we started receiving some calls in New

17    York that were threatening my grandmother.  They wanted

18    something, when my mom got arrested, she got arrested, I believe,

19    with $500,000 and some drugs were involved also, and there was a

20    lot of money involved here, and some people down there wanted to

21    get their money back, and they started calling the house,

22    threatening us.

23              Q.    And what happened after that?

24              A.    I had gone to Miami, and I got assaulted in

25    December of '91.  I was in a phone booth and some guy just came
```

cls

1    up to me and started slashing my throat and my face.

2            Q.    When was that?

3            A.    In '91, December of '91.

4            Q.    And did you ever discover who that person was?

5            A.    No, Your Honor, I never, I never met this person.

6            Q.    What happened --

7            A.    (indiscernible) for that assault.  I was arrested

8    that day that they took me to the trauma center in Miami, in my

9    possession they had found a small amount of cocaine, and that's

10   where this charge comes from, that's where my name Carlos Rossi

11   comes out.  During that period of time, I was afraid of my life,

12   so I had gotten an ID with a different name, and that's why I was

13   using that ID.  Subsequently, I got, that same night I was in the

14   trauma center, they had gone through my clothes and they found

15   small sums of cocaine.  That charge itself was eventually

16   dismissed.  It was a minor amount.

17           Q.    All right.

18           A.    After I was released from that hospital, I went

19   back to California, and because of this problem that extended

20   from my, from the past, I went and I was arrested on receiving

21   stolen property under the same name again of Carlos Rossi.  These

22   are the only, these are the two times I used this name, Your

23   Honor, and it extends again from, from, from what's happened,

24   from what started happening since my mom.

25           Q.    All right, and then what happened in 1992?

A 31 221 000                          25                    August 2, 2000

cls

1          A.   Regarding what, my arrest, Your Honor?

2          Q.   Yes.

3          A.   In 1992, I eventually found out that they were

4    looking for my brother and myself.  Now, back then I was using

5    drugs, Your Honor.  I had, you know, problems.  I didn't have no

6    one to turn to.  I was consuming them, and when I found out that

7    they were looking for me, I had left New York.  My brother

8    eventually left New York also, and I got to New York and I stood

9    at the house for a while.  We had a property in Miami that my

10   uncle had left me.  He died of AIDS in the year prior to that,

11   and I had went to Miami to try to either sell the property or fix

12   the loan that he had gotten on that property.  And I had then

13   (indiscernible) upon that they had arrested my brother in New

14   York, pending an indictment in California.  Again, I was under

15   the, you know, I was consuming and I was afraid.  I didn't know

16   who to turn to, and I disappeared for a while.  Eventually, when

17   I had gotten back to my senses, and --

18         Q.   All right, so what drugs were you abusing?

19         A.   Cocaine and marijuana, Your Honor.

20         Q.   All right, now, did there come a time that, in

21   July or August '92 that you delivered a cashier's check to an

22   auto body shop in Los Angeles?

23         A.   No, Your Honor.

24         Q.   So if says that in the superseding indictment,

25   that's false?

cls

1        A.   Your Honor, that testimony from that person, that,

2  I mean, that's, and during the trial, it was brought up to the

3  attention that that person had signed 302s before saying that he

4  did not know me and that he had received that check through the

5  mail.  During my trial, this person was arrested in California on

6  some other charges, and then he decided to change his testimony,

7  saying that he had lied before and that, in fact, I did give him

8  that check.  I never met that person before and I did never, I

9  never handed him that check.

10       Q.   All right, so go ahead.  What happened?

11       A.   Eventually, when I came back down to my senses, I

12  knew I wasn't going nowhere and this was not my life, the way my

13  mom had lived before, and I was, I was desperate.  I had turned

14  myself in to the U.S. Marshals in New York in April of '96.  My

15  grandmother's been through a lot.  She, there were death threats

16  at the house, they had to put gates, they had to get a dog.  In

17  that same period of time when I was gone and my brother got

18  arrested, one of my cousins in New York got kidnapped.  The FBI

19  intervened in that, in that situation, and she was released, and

20  these people were apprehended except, I believe, one or two

21  people.  They wanted the New York house where the family lives.

22       Q.   All right, hold on.

23       A.   They kept asking for that property.

24       Q.   Hold on.  So you said you disappeared for a while.

25       A.   Yes, Your Honor.

cls

1    Q.   Was that in 1992?

2    A.   It extended from '92, from '93 to '96.

3    Q.   And where were you when you were disappeared?

4    A.   Miami, Your Honor.

5    Q.   All right, and then in '96, you said you turned

6    yourself in?

7    A.   Yes, Your Honor.

8    Q.   What month?

9    A.   April 17 of '96.

10   Q.   All right, now, this cousin, tell me about this

11   cousin.  How is he related to you?

12   A.   My cousin, she's my aunt's daughter.  My mother's

13   sister.

14   Q.   What is her name?

15   A.   Adriana Perez.

16   Q.   And she was kidnapped?

17   A.   Yes, Your Honor.

18   Q.   And who do you believe kidnapped her?

19   A.   Well, people from South America, Your Honor.  I

20   don't know who these people are.

21   Q.   What were their demands?

22   A.   The house where the family lives in New York.

23   Q.   Where was this house in New York?

24   A.   At 68th and Woodset (phonetic sp.) Avenue in

25   Queens.

A 31 221 000                    28            August 2, 2000

cls

1      Q.   What was the approximate worth of the house?

2      A.   Oh, Your Honor, I wouldn't know.  We've been

3  living in that house for the last 20 some years.  We've still

4  been paying to the bank.  It could be more that $500,000.

5      Q.   All right, so she was kidnapped and then the FBI

6  assisted to get her released?

7      A.   Yes, Your Honor.

8      Q.   And what happened?

9      A.   She was eventually released, and I believe some

10  people were apprehended.

11     Q.   All right, and what happened with your brother?

12     A.   My brother, Your Honor, while he was in

13  (indiscernible) in California, he was there, and he pleaded out

14  to a charge.  Eventually, he got released and he reported for a

15  while to his probation officer, but my brother's been very close

16  to the whole family.  He's a U.S. citizen, and he's always been

17  in contact with the family, and since two years back now, all

18  communications have stopped.  He didn't write no more, he didn't

19  call my grandmother no more, his girlfriend, his school buddies.

20  Nobody seems to know what happened to him.  My aunt, my

21  grandmother have gone numerous times to the precinct, the 110th

22  Precinct in the New York, to try to fill the missing persons

23  report, and they have stated that he's an adult.  Maybe he

24  decided to go on his own.  That there was, they couldn't fill out

25  a report.  This is not my brother, he's very close, and --

A 31 221 000                    29                    August 2, 2000

cls

| | | |
|---|---|---|
| 1 | Q. | What's your brother's name? |
| 2 | A. | Victor Jaramillo. |
| 3 | Q. | Victor K? |
| 4 | A. | Excuse me, Your Honor? |
| 5 | Q. | Karamillo? |
| 6 | A. | Yes, Your Honor. |
| 7 | Q. | How do you spell that? |
| 8 | A. | J-A-R-A-, J-A-R-A-M-I-L-L-O. |

9    Q.    All right.  Perez, right?  And you said that he

10   entered a plea.  What did he plea to?

11       A.    The money laundering, that check, Your Honor.

12       Q.    And when was that?  When did he plead, if you

13   know?

14       A.    I believe he did that in '94.  I'm not sure.

15       Q.    All right, and then he was on parole or probation

16   and he disappeared.

17       A.    (indiscernible), yes, Your Honor.

18       Q.    And you have no information of what might have

19   happened to him?

20       A.    No, Your Honor.  I had some friends try to get

21   into the computer down in LA to see if maybe he got in trouble

22   again with the law or if he's been in any hospitals, anything,

23   and nothing.

24       Q.    All right.  Then what happened after that?

25       A.    Well, I'm here, I mean, I'm doing this time, Your

A 31 221 000                    30                    August 2, 2000

cls

1    Honor, and I'm.

2         Q.   All right, now I'm going to have, the attorney for

3    the INS is going to want to ask you some questions, so I'm going

4    to move the camera onto her.

5    JUDGE FOR THE RECORD

6         Whoops, take a minute here.  Okay.  All right.

7    JUDGE TO MS. RANSOME

8         Q.   All right, Ms. Ransome, you may proceed.

9         A.   Thank you.

10   MS. RANSOME TO MR. PEREZ

11        Q.   Mr. Perez, your mother's been convicted of drug

12   trafficking, hasn't she?

13        A.   I believe, yes.

14        Q.   She's your mother, don't you know?

15        A.   No, I have never lived with my mom.  All I know is

16   from the extent that when I got in trouble with this, I learned

17   more about her past.  I never knew what she did before.

18        Q.   But you never knew what she did before, but you

19   knew enough to go pick up some money for her, is that right?

20        A.   She had asked me that people owed her some money.

21        Q.   You yourself have been convicted of money

22   laundering, correct?  Correct?  .

23        A.   On this charge?

24        Q.   Yes.

25        A.   The conspiracy to --

A 31 221 000                    31                    August 2, 2000

cls

1    Q.    Yes.

2    A.    Excuse me?

3    Q.    Sir, you yourself --

4    A.    On this charge.

5    Q.    Hold it a minute.  You yourself have been

6    convicted of money laundering, correct?

7    A.    On this charge?

8    Q.    Yes.  And your brother's pled guilty to money

9    laundering, correct?

10    A.    Yes, he did.

11    Q.    Okay.

12    A.    Yes, he did.

13    Q.    Now, this attack when you were in a phone booth,

14    that happened in the United States, correct?

15    A.    This happened in Miami.

16    Q.    That's the United States, correct?

17    A.    Yes, ma'am.

18    Q.    Okay, and the kidnapping of your cousin, that

19    happened in the United States, correct?

20    A.    Yes, ma'am.

21    Q.    And your brother's disappearance, that happened in

22    the United States, correct?

23    A.    Yes, ma'am.

24    Q.    So would it be fair to say, Mr. Perez, that you

25    are in as much danger here in the United States as you would be

cls

1      in Colombia or anywhere else?

2              A.   I wouldn't think so.

3              Q.   Well, sir, not according to the petition that you

4      wrote, petition for Convention Against Torture protection.

5              A.   Yes, ma'am.

6              Q.   You seem to indicate in that petition that your

7      family has had problems here in the United States, including

8      kidnapping, threats, people asking for money.  Do you remember

9      writing any of that in your petition?

10             A.   Yes, that's an extension of the people from South

11     America.  Due to my mom's involvement and her situation, it's not

12     mine.

13             Q.   So you yourself just admitted, so that people in

14     South America wanted to get you, they could fly here and do so,

15     correct?

16             A.   Well, they want to get me or my brother, someone

17     in the family, due to my mom's involvement.

18             Q.   That may be, but if they wanted to, they could

19     come here and get you, correct?

20             A.   Well, if they tried.  They have tried, and it

21     seems for a while now nothing has happened since.  I've been in

22     prison and my cousin's been out, and she's back in New York.  The

23     family put some gates, got a dog, and they're, so far nothing has

24     happened.

25             Q.   Your family has --

A 31 221 000                    33                    August 2, 2000

cls

1        A.   The only thing that --

2        Q.   Go ahead, sir.  Go ahead.

3        A.   The only thing that we got (indiscernible) right

4    now, ma'am, is my brother.

5        Q.   Your family has had to put gates around their

6    house and your family has had to get a dog because your family is

7    involved in a very dirty business, which is drug trafficking.

8        A.   No, not my family, my birth mother.

9        Q.   Your mother.

10       A.   My family --

11       Q.   Go ahead, sir.

12       A.   My mother to me is my grandmother, the lady who

13   raised me since I was of the age of one.  My birth mother, she's,

14   that's what she is, my birth mother, that's all she is to me.

15       Q.   Then according to you, if you all have clean hands

16   and you don't have anything to do with your mother's drug

17   trafficking business, why is it that you have fears and concerns

18   for yourself, since you claim that you're not involved?

19       A.   Because my mom --

20       Q.   Go ahead, sir.

21       A.   Because it's my mom's activities, and people down

22   there want to get to her through us.  They cannot get to her

23   where's she at.

24       Q.   Then it would appear, then, sir, that, Mr. Perez,

25   that it might be in your best interests to leave the United

A 31 221 000                    34                    August 2, 2000

cls

1    States, because then you'd be away from your mother and her

2    problems.

3           A.    Not to South America, ma'am, because the people

4    that want this is people down there.  It would be worse over

5    there than here.

6    MS. RANSOME TO JUDGE

7           Q.    Your Honor, the Government has no further

8    questions.

9           A.    All right.

10   JUDGE TO MR. PEREZ

11          Q.    All right, now, Mr. Perez, is there anything else

12   you can tell me why, if you went back to Colombia, either an

13   official or agency of the Colombian government or someone working

14   with the approval of such an agency would want to detain you and

15   torture you?

16          A.    Your Honor, I really wouldn't know how to answer

17   that question.  My concern is that from what I learned, I've

18   never lived in South America.  I've been here all my life.  Like

19   I said before, I was raised by my grandmother, and just by

20   reading and seeing what's going on down there and with all this

21   narco-terrorism.  Your Honor, I'm not trying to pretend that I'm

22   an angel, but these things that have happened to me because of my

23   mom, not myself.  I tried to help my mom.  I could say that,

24   while I've been here and I've been going to different courses,

25   I've seen that I was dependent on my mom in a certain way, they

A 31 221 000                     35                  August 2, 2000

cls

1    way she raised us.  She was never there with us, but she
2    materializes.  She helped us with the school or on anything that
3    we needed, so I depended on her.  When she got in trouble, my
4    grandmother asked us and we moved to LA to help her out.  In no
5    time did I intend or did I put myself on to be a trafficker or
6    money launderer.  Due to her activities, it created a lot of
7    problems for my family, for our family.  And that still didn't
8    mean that because she did that, all the Perez family was involved
9    (indiscernible).  No, Your Honor.  I'm afraid to go back down
10   there because of her activities.  These people, the things that
11   happened to us in this country, they extend from down there.  The
12   people down there are ordering this.  The person who did this to
13   me, on the police report, he's a South American man.  My cousin
14   got kidnapped by Colombian people.  My brother, I can't say
15   nothing.  We don't know nothing.  He just disappeared, and it's
16   just, that's not him.  I mean, that, this has been, I mean
17   problem after problem.  Now, my fear is that, that the way things
18   are down there right now with the groups, the militias, the
19   guerrillas, the paramilitaries, I don't know who's who.  I don't
20   know who's working with who or who's what.

21       Q.   All right, so Mr. Perez, what I'm going to do,
22   then, is I'm going to issue a written decision.  Now, Ms. Ransome
23   is sending you the State Department report on the human rights
24   situation in Colombia, and rather than asking you to respond to
25   it, given the difficulty of the situation that we have here, I'm

A 31 221 000                      36                    August 2, 2000

cls

1    just going to assume for the record that you're opposed to it

2    being made part of the record.  And --

3              A.   Yes.

4              Q.   Then I'll go ahead and act accordingly with that

5    assumption, and then I will get a written decision out and try to

6    get it to the prison prior to August the 24th, all right?

7              A.   All right, Your Honor.

8              Q.   And I'm going to take into account everything that

9    you said today and all of the documentation that you submitted,

10   and I'm going to make a ruling that anything that your

11   grandmother or aunt might have to say in the case would -- well,

12   let me put it this way, I'm going to find that you are a credible

13   witness.  I'm going to assume for the purpose of this hearing

14   that everything that you have said is true about your being

15   assaulted in Miami, about your brother disappearing without a

16   trace, about your cousin, and that if your grandmother or aunt

17   came in to testify that they would, their testimony would be to

18   corroborate those kind of things.  And that therefore --

19             A.   And my cousin, the one --

20             Q.   And your cousin.  And that therefore their

21   testimony is not necessary for this adjudication.  All right?

22             A.   All right, Your Honor.  All right.

23   JUDGE TO MS. RANSOME

24             Q.   All right, anything else for the record today, Ms.

25   Ransome?

A 31 221 000                    37                    August 2, 2000

cls

1           A.   No, Your Honor, thank you.

2    JUDGE TO MR. PEREZ

3           Q.   Mr. Perez, anything else for the record?

4           A.   Well, so are you going to answer my request?   Is

5    that, do I still have an appeal or something?

6           Q.   Yes, if you're not happy with my decision, there

7    will be a right to appeal, and we will send you that information.

8    If you do have to appeal, then as the forms will explain, you

9    have 30 days to file a one-page form, which is a notice of

10   appeal.  That's not your brief, it's just the reason why --

11          A.   Right.

12          Q.   You wish to appeal, and my advice to you is that

13   if you appeal, do it earlier rather than later.  In other words,

14   don't wait until --

15          A.   All right, Your Honor.

16          Q.   Day 25 to file an appeal, because I know that

17   sometimes it takes a while to get the mail out of the

18   institution, and if your appeal is received by the appeal court

19   even one day late, then they will dismiss it.  So if --

20          A.   All right, Your Honor.

21          Q.   When we send you the material, we will make it

22   very clear what day you would have to appeal by if you choose to

23   appeal.  All right, that's all.

24          A.   Your Honor, well --

25          Q.   Yes, sir.

A 31 221 000                    38                    August 2, 2000

cls

1          A.   Your Honor, one question, yeah.  I'm leaving, I'm

2    finishing the 24th of this month.  Will I be addressing you again

3    or this is it?  Will this be moved to another court?

4          Q.   This will be it, and then you would be, they would

5    move you to a different facility if it comes to that.

6          A.   Right.  All right, thank you, Your Honor.

7          Q.   All right.  Best of luck to you, sir.

8                              HEARING CLOSED

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE PAGE

I hereby certify that the attached proceeding before

JUDGE PAUL GRUSSENDORF, in the matter of:

CARLOS ALBERTO PEREZ

A 31 221 000

Philadelphia, Pennsylvania

was held as herein appears, and that this is the original

transcript thereof for the file of the Executive Office for

Immigration Review.


_____
(Carol Schlenker, Transcriber)


Deposition Services, Inc.
6245 Executive Boulevard
Rockville, Maryland  20852
(301) 881-3344


October 18, 2000_____
(Completion Date)

Exhibit

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
Philadelphia, Pennsylvania

File No.:  A 31 221 000                                    August 2, 2000

In the Matter of

CARLOS PEREZ,                        )          IN REMOVAL PROCEEDINGS
                                     )
          Respondent                 )

CHARGE:        Section 237(a)(2)(A)(iii) of the Immigration and
               Nationality Act, conviction of an aggravated
               felony as defined in Section 101(a)(43)(D) and (U)
               of the Act.

APPLICATION:   Convention Against Torture, Article 3, 8 C.F.R.
               208.

ON BEHALF OF RESPONDENT:          ON BEHALF OF SERVICE:

Pro se                            Pamela Ransome, Esquire
                                  Assistant District Counsel

                    ORAL DECISION OF THE IMMIGRATION JUDGE

          On October 27, 1999, the Immigration and

Nationalization Service issued Form I-862, Notice to Appear, in

the name of the respondent Carlos Perez, A 31 221 000.  In the

Notice to Appear, it is alleged that the respondent is not a

native or citizen of the United States, that he is a native and

citizen of Colombia, that he was admitted to the United States on

or about February 13, 1972, as an immigrant and that he was on

June 17, 1997, convicted in the United States District Court,

Northern District of California, for the offense of conspiracy to

Exh. 3

kad

launder money, in violation of Title 18 U.S. Code Section 371.
It is charged that the respondent is removable from the United
States pursuant to provision of law Section 237(a)(2)(A)(iii) of
the Immigration and Nationality Act, in that an any time after
admission he has been convicted of an aggravated felony as
defined in Section 101(a)(43)(D) of the Act, a law relating to an
offense described in Title 18 U.S. Code, Section 1956, if the
amount of the funds exceeded $10,000.

Respondent initially had appeared in Court on November
30th, 1999, and was given numerous continuances for the purposes
of seeking counsel and for filing an application for relief.  The
respondent was not able to obtain counsel.  The respondent was
placed under oath on May the 10th, 2000, at a master calendar
appearance and the respondent admitted the factual allegations.
The charge of removability was orally amended by Government's
counsel to include next to the words aggravated felony as defined
in Section 101(a)(43)(D), the words "and(U)."  The Court has made
a finding by evidence that is clear and convincing that the
factual allegations and the charge of removability have been
sustained.  The Government has submitted to the record what has
been marked as Exhibit 2, a Form I-213, record of deportable
alien, and a record of conviction on the underlying matter, which
shows that the respondent was found guilty on June the 9th, 1997,
of a violation of Title 18 U.S.C., Section 371, conspiracy to
launder money.  Exhibit 2 includes a superseding indictment in

A 31 221 000                          2                    August 2, 2000

kad

this case which reflects that on at least one occasion, the
respondent was involved with passing a cashier's check in the
amount of $53,000. See page 6 of the superseding indictment.

The Court made a finding that the respondent's
conviction qualifies as an aggravated felony. The respondent has
been sentenced to a period of 60 months in prison. The
respondent claims fear of returning to Colombia. The respondent,
having been convicted of an aggravated felony, does not qualify
for any relief from removal under the statute, including asylum
under Section 208 of the Act or withholding of removal under
Section 241(b)(3) of the Act. However, the respondent is
eligible to request deferral of removal under Section 8 C.F.R.
Section 208.13 et seq. deferral of removal under the United
Nations Convention Against Torture and Other Forms of Cruel,
Inhuman or Degrading Treatment or Punishment (Torture
Convention).

The respondent appeared on August the 2nd for an
individual hearing on his application for relief. The respondent
submitted an I-589, which is the proper form to submit in such
proceedings and attached thereto is an affidavit. The I-589 and
the affidavit have been marked as Exhibit 3. The respondent has
also submitted an exhibit marked Exhibit 4, which includes
pleadings which are titled Petition for Convention Against
Torture Protection and another pleading called To The Honorable
Court and INS Counsel and a copy of an affidavit and a pleading

A 31 221 000                    3                   August 2, 2000

kad

called respondent's Motion to Vacate the Deportation Order and numerous newspaper articles pertaining to country conditions in Colombia and a lengthy report from the U.N. High Commissioner for Human Rights on the office of Colombia. And additionally, numerous certificates which the respondent has earned while incarcerated where he has applied himself in various aspects of learning and counseling and Bible studies and things of that nature.

Exhibit 5 is the State Department Country Report for Human Rights Practices for Colombia, 1999, published in the year 2000.

The 1999 Country Report was submitted on the date of the individual hearing on August the 2nd. The respondent had to object to its submission into the record because he had not had the opportunity to review it and the Court has preserved his objection to that document coming in. The Court has examined in great detail all of the evidence and documents submitted in this case, even if it does not specifically refer to a particular item and its decision.

<u>REQUIREMENT FOR A GRANT OF DEFERRAL OF REMOVAL</u>

<u>UNDER THE CONVENTION AGAINST TORTURE</u>

A respondent who is otherwise not eligible to apply for withholding of removal under Section 241(b)(3) of the Act may, nevertheless, apply for a deferral of removal under Article 3 of the Convention Against Torture if he can show that "it is more

A 31 221 000                    4                    August 2, 2000

kad

likely than not" that he would be tortured if removed to the
proposed country of removal. 8 C.F.R. Section 208.16(c)(2).
This burden can be established by testimony without corroboration
if the testimony is credible. <u>Matter of Y-B-</u>, Int. Dec. 3337
(BIA 1998). Torture is defined as "any act by which severe pain
or suffering, whether physical or mental is intentionally
inflicted on a person." 8 C.F.R. 208.18(a)(1). The severe pain
or suffering must be inflicted on the applicant for one of four
purposes; specifically, 1) "for obtaining information or a
confession;" 2) "for punishing for an act committed or suspected
of having committed;" 3) "for intimidation or coercion;" or 4)
"for any reason based on discrimination of any kind." In
addition, in order to constitute torture, "the act must be
directed against a person in the offender's custody or physical
control," and the pain or suffering must be inflicted "by or at
the instigation of, or with the consent or acquiescence of a
public official or other person acting in an official capacity."

## FACTS OF THE CASE

The respondent has related a story of drama and
intrigue involving his family members and criminal elements
associated with drug trafficking and, in the respondent's own
words, "narco-terrorism." The respondent's family originates
from Colombia. The respondent testified that his mother was
involved in some criminal activities and that it was through her

A 31 221 000                     5              August 2, 2000

kad

intervention that he innocently got involved to the point of
receiving a conviction for money laundering.

The respondent was born on April 4, 1966, in Bogota,
Colombia.  He has never married and has no children.  He came to
the United States at the age of six.  He attended school through
the eighth grade, and in 1986 he obtained his GED.  In 1983, he
received a private pilot's certificate.

In 1990, the respondent was living with his grandmother
in New York.  He indicated that his grandmother has essentially
raised him.  His mother lived in California.  She was coming out
of incarceration for, apparently, a drug-related offense and then
she was caught up in deportation proceedings.  She contacted the
respondent and asked that he and other family members come to
California to assist her in her defense.  The respondent and his
brother and his grandmother went to California, and then his
mother was rearrested on another charge and the respondent
returned to New York.  His mother asked the respondent to assist
in obtaining some money for her defense.  The respondent and his
grandmother and his aunt and his brother returned to California.
And his mother asked the respondent to make some phone calls in
order to collect some money for her from individuals which owed
her money so that, that money could be provided to her attorney
for her defense.  The respondent says that he spoke to two
different people and one person gave the respondent $8,000 to
hand to her attorney.  Then threats started coming in to the

kad

respondent's grandmother's house in New York.

In the December of 1991, the respondent was making a phone call from a phone booth in Miami, Florida when he was assaulted and his throat was slashed and he was almost murdered. He testified that he did not know the assailant.

The respondent's brother was arrested and in 1994 plead to a charge of money laundering.  He was free on unsupervised release when he disappeared without a trace.  The family has no idea of the whereabouts of the brother since 1994.

The respondent explained that due to the turmoil and difficulties in his life, he essentially went underground; and from 1993 to 1996, he was underground.  The Court did not inquire any further as to details of that period of his life.

The respondent's cousin, who is the daughter of his mother's sister, Adviana Perez, was kidnaped by unknown individuals from South America.  As ransom, the kidnappers demanded that the house, the family house in New York, be deeded over to the kidnappers.  The FBI intervened in this case and obtained the release of his cousin, and some people were apprehended.

In April 1996, the respondent turned himself in to Federal Marshals and he was ultimately convicted of the money laundering scheme.

The respondent fears the individuals who are associated with these illicit drug trafficking activities and who have

A 31 221 000                    7                    August 2, 2000

kad

already evidenced their ability to harm the respondent and members of his family.

### FINDINGS OF THE COURT

As Government's counsel astutely pointed out in this case, the respondent would seem to have as much, if not more, danger of being harmed in the United States as he does if returned to Colombia. The respondent explains he was assaulted by an individual who he believes to be associated with these drug trafficking elements and his throat was slashed and he was almost murdered. His cousin was kidnaped. His brother has disappeared without a trace, all in the United States. Now the respondent asks that he not be returned back to Colombia where his life would be in danger. Clearly if his life is in danger, it is just as well in danger in the United States as in any other country.

The respondent's facts do not meet the requirements for a grant under the Convention Against Torture Article 3. The respondent has in no way demonstrated that if he is returned to Colombia, he is likely to be tortured while in the custody of an official of the government or by someone with the acquiescence of such government official. The respondent has not met his burden of more likely than not that he would be tortured if he is returned to Colombia while in the custody of any agents or agency of the Colombian government.

For the purposes of this adjudication, the Court has accepted as credible the respondent's relation of events. The

A 31 221 000                    8                    August 2, 2000

kad

Court believes, as the respondent related, that he was viciously assaulted, his cousin was kidnaped, and his brother has disappeared.  Because the Court accepts the respondent's story as essentially true, perhaps with a caveat as far as the respondent's denial of guilt in the criminal scheme, the Court did not find it necessary or particularly helpful to continue the case to another date to allow the respondent's grandmother and aunt to testify.  The Court had set aside a period of time on August the 2nd to receive their testimony if they appeared in court, but the Court does not feel that they would in any way be able to shed any further light on the likelihood of the respondent's meeting the legal burden under the definition of torture should he be returned to Colombia.  The Court feels that at most they could further corroborate the respondent's relation of events pertaining to other family members in the United States.

The Court must deny the respondent's application for deferral of removal under the Convention Against Torture in that he has not met his burden of proof that it is more likely than not that he would be tortured as that word is defined at 8 C.F.R. Section 208.18 should he be returned to Colombia.

A 31 221 000                          9                    August 2, 2000

kad

## ORDER OF THE COURT

WHEREFORE the respondent's application of deferral of removal under the Convention Against Torture shall be denied.

WHEREFORE respondent shall be removed and deported to Colombia.

August 22, 2000

PAUL GRUSSENDORF
Immigration Judge

Exhibit

2000 WL 1372883
(Cite as: 2000 WL 1372883 (M.D.Pa.))
C

Only the Westlaw citation is currently available.

United States District Court, M.D. Pennsylvania.

Kingsley CHUKWUEZI, Petitioner
v.
Janet RENO, et al., Respondents

No. CIV. A. 3:CV-99-2020.

May 16, 2000.

MEMORANDUM

VANASKIE, Chief J.

*1 Pending in the above-captioned matter are the objections of respondent Attorney General Janet Reno to Magistrate Judge Thomas M. Blewitt's Report and Recommendation, which proposes that the challenge of petitioner Kingsley Chukwuezi to the mandatory detention provisions of 8 U.S.C. § 1226(c) be sustained. Specifically, Magistrate Judge Blewitt found persuasive those district court decisions which found unconstitutional section 1226(c)'s mandatory detention of an alien pending the outcome of removal proceedings that had been instituted on the ground that the alien had been convicted of an "aggravated felony."

Chukwuezi, a native and citizen of Nigeria, was lawfully admitted to the United States in 1990, and became a lawful permanent resident alien in May of 1997. Chukwuezi alleges that he has been married to a United States citizen since December of 1992. The factual premise for the decision to commence removal proceedings against Chukwuezi is his January 28, 1998 conviction in the United States District Court for the District of Maryland of the offense of fraud and misuse of an alien registration card in violation of 18 U.S.C. § 1546(a).

On or about May 17, 1999, Chukwuezi completed his 15-month sentence for this conviction. Upon his discharge from confinement by the federal Bureau of Prisons, Chukwuezi was taken into custody by the Immigration and Naturalization Service (INS) under the authority of section 236(c)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c)(1). [FN1] The INS asserts that Chukwuezi is deportable pursuant to section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii), on the ground that his conviction constitutes an aggravated felony as defined in Section 101(a)(43)(P) of the Act, 8 U.S.C. § 1101(a)(43)(P). [FN2] On September 2, 1999, Chukwuezi was ordered deported to Nigeria based upon his conviction. He was also denied release pending the completion of removal proceedings due to the mandatory detention provisions of 8 U.S.C. § 1226(c)

> FN1. Section 1226(c) states that "[t]he Attorney General shall take into custody any alien who ... is deportable by reason of having committed ... any [aggravated felony as defined in 8 U.S.C. § 1101(a)(43) ] ... when the alien is released [from confinement pursuant to a conviction]." Section 1226(c)(1) thus contemplates that, upon discharge of a sentence of imprisonment, an alien will be taken into INS custody and remain detained until completion of removal proceedings. Only if the release of such an alien is necessary to provide protection to a witness or person cooperating with a criminal investigation and the Attorney General is satisfied that such an alien will not pose a danger to other persons or property and will not flee may the alien be released while removal proceedings are pending. See 8 U.S.C. § 1226(c)(2).

> FN2. Section 101(a)(43)(P) defines the term aggravated felony as including "an offense of ... (I) ... falsely making, forging, counterfeiting, mutilating or altering a passport or instrument in violation of Section 1543 of Title 18, or is described in Section 1546(a) of such title (relating to document fraud) and (ii) for which the term of imprisonment is at least 12 months ...." 8 U.S.C. § 1101(a)(43)(P).

Contending that his offense should not be regarded as a deportable aggravated felony, Chukwuezi has appealed the order of removal to the Board of Immigration Appeals. On November 17, 1999, he filed in this Court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging the mandatory detention provisions of § 1226(c) as unconstitutional on its face and as applied to him. [FN3]

> FN3. Chukwuezi's habeas petitions also challenged the Immigration Judge's determination that Chukwuezi's offense of conviction is an aggravated felony. Because that matter is still before the Board of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Immigration Appeals, consideration of that issue in this case is premature.

As Magistrate Judge Blewitt observed, the judicial decisions on the validity of the mandatory detention provisions of 8 U.S.C. § 1226(c) are in conflict. In *Parra v. Perryman,* 172 F.3d 954 (7th Cir.1999), *Galvez v. Lewis,* 56 F.Supp.2d 637 (E.D.Va.1999), and *Diaz-Zaldierna v. Fasano,* 43 F.Supp.2d 1114 (S.D.Cal.1999), attacks on the constitutionality of the mandatory detention provisions of § 1226(c) were rejected. By way of contrast, in *Bouayad v. Holmes,* 74 F.Supp.2d 471 (E.D.Pa.1999); *Danh v. Demore,* 59 F.Supp.2d 994 (N.D.Cal.1999), *Van Eeton v. Beebe,* 49 F.Supp.2d 1186 (D.Ore.1999), and *Martinez v. Greene,* 28 F.Supp.2d 1275 (D.Colo.1998), the mandatory detention provisions were found to be unconstitutional.

*2 Having given plenary consideration to the matter, as required when a party files objections to a Magistrate Judge's Report and Recommendation, 28 U.S.C. § 28 U.S.C. § 636(b)(1)(C); *Sample v. Diecks,* 885 F.2d 1099, 1106 n. 3 (3rd Cir.1989); *Henderson v. Carlson,* 812 F.2d 874, 878 (3rd Cir.), *cert. denied,* 484 U.S. 837 (1987); *Owens v. Beard,* 829 F.Supp. 736 (M.D.Pa.1993), I find that the decisions rejecting constitutional challenges to § 1226(c) are limited to the factual scenarios presented in those cases and that those factual scenarios are materially distinguishable from that presented here. For example, in *Parra,* the Seventh Circuit relied upon the fact that the petitioner conceded that he was a removable alien because of his conviction of aggravated sexual assault. Because of this concession, the petitioner effectively had the keys to his release as he could have simply consented to his removal to his native Mexico. Judge Easterbrook, writing for the unanimous appeals court panel, observed that "[a] criminal alien who insists on postponing the inevitable has no constitutional right to remain at large during the ensuing delay [to effect removal], and the United States has a powerful interest in maintaining the detention in order to ensure that removal actually occurs." 172 F.3d at 978. In *Galvez,* the petitioner was an illegal alien with a drug conviction. In finding that mandatory detention as applied in *Galvez* was not unconstitutional, the court explained that "[t]his case turns on Petitioner's unlawful alien status in this country." 56 F.Supp.2d at 646. In *Diaz-Zaldierna,* the petitioner had been convicted of possession of crack cocaine, and the court concluded that the "controlled substances conviction is a sufficient ground to detain him without possibility of bail, at least for a reasonable

time while his removal is adjudicated." 43 F.Supp.2d at 1120.

In this case, unlike *Parra,* Chukwuezi does not concede that his conviction requires his removal from the United States. Unlike *Galvez,* Chukwuezi is not an illegal alien in this country; he has attained lawful permanent residence status. And unlike *Diaz-Zaldierna,* Chukwuezi does not stand convicted of a drug offense. Because the rationale of *Parra, Galvez,* and *Diaz-Zaldierna* were so linked to the factual settings of those cases, their holdings are unpersuasive here.

More persuasive are those decisions that have recognized that mandatory detention whenever the Attorney General charges an alien with an aggravated felony conviction sweeps too broadly. Those cases have recognized that INS detention is indistinguishable from punitive incarceration. Although INS detention is plainly regulatory and not intended as punishment, *see Martinez,* 28 F.Supp.2d at 1282, the reality is that it as restrictive as punitive confinement. As Judge Weis remarked recently:

Characterizing prolonged detention as anything other than punishment might be somewhat puzzling to petitioner, who remained in jail under the same conditions as before the state released him, although his status had technically changed from that of a state inmate to an INS "detainee." Similarly, an alien whose detention occurs in a maximum security federal prison may be forgiven for wondering when his punishment stopped and detention began. As Justice Jackson remarked, "[i]t overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound ." *Mezei,* 345 U.S. at 220 (Jackson, J., *dissenting* ). It is similarly unrealistic to believe that these INS detainees are not actually being "punished" in some sense for their past conduct.

*3 *Ngo v. INS,* 192 F.3d 390, 397-98 (3d Cir.1999). Finding a fundamental liberty interest implicated in the detention of aliens awaiting a final removal decision, the courts that have found § 1226(c) unconstitutional have applied the compelling interest test of *United States v. Salerno,* 481 U.S. 739 (1987). *See, e.g., Danh,* 59 F.Supp.2d at 1000-01; *Van Eeton,* 49 F.Supp.2d at 1189-90; *Martinez,* 28 F.Supp.2d at 1281. Concluding that mandatory detention of *all* criminal aliens is "excessive" in relation to the purposes sought to be advanced by § 1226(c)-- prevention of flight, protection of the community, and

assure enforcement of the immigration laws--those courts have directed that the INS afford some process by which a criminal alien can secure release pending the outcome of removal proceedings.

As note above, I find the rationale of cases such as *Danh, Van Eeton* and *Martinez* to be compelling. Clearly in a case such as this one, involving a lawful permanent resident, incarceration implicates a liberty interest. Equally clearly, a statute that presumes that all criminal aliens will abscond or pose a threat to safety sweeps too broadly.

In some cases, § 1226(c) would ensnare a person who has resided in the United States for decades and has an arguable claim to citizenship. *See e.g., Van Eeton, supra.* As to such a person, he or she would be detained notwithstanding the existence of a bona fide challenge to the removal proceedings and the absence of any evidence of a flight risk or threat to safety. Unlike the situation confronting the court in *Parra,* a person subject to the removal process who claims citizenship cannot be regarded as having the keys to liberty. On the contrary, compelled confinement may provide the motivation to forego pursuit of an arguably valid defense to removal.

Also swept up in § 1226(c) is a lawful permanent resident alien's challenge to a determination by the INS that the offense of conviction constitutes an "aggravated felony." Section 101(a)(43) of the Immigration and Naturalization Act is a lengthy and complex provision. There will be cases where it is unclear that a criminal offense constitutes an "aggravated felony." In such cases, a lawful permanent resident of long standing will be forced to remain in custody while pursuing a challenge to the INS determination that he or she is subject to removal notwithstanding the absence of any evidence of a risk of flight or danger to the community.

The fact that an Immigration Judge will make an initial decision as to whether an offense of conviction constitutes an aggravated felony does not ameliorate the problem. Even where an Immigration Judge makes a determination that the detainee is not subject to removal, the INS may continue to detain the alien by filing its own notice of intent to appeal. *See* 8 C.F.R. § 3.19(1)(2) (1999). [FN4] Thus, even a prompt determination by an Immigration Judge that an alien's conviction does not constitute an aggravated felony so that he or she is not subject to removal does not alter the alien's detention status under § 1226(c).

FN4. Section 3.19(l)(2), in pertinent part, provides:

If an alien is subject to [8 U.S.C. § 1226(c)(1) ], ... any order of the immigration judge authorizing release (on bond *or otherwise* ) shall be stayed upon the Service's filing of a Notice of Service Intent to Appeal Custody Redetermination (Form EOIR-43) with the Immigration Court on the day the order is issued, and shall remain in abeyance pending decision of the appeal by the Board of Immigration Appeals. [Emphasis added.]

*4 Our Court of Appeals' decision in *Ngo v. INS,* 192 F.3d 390 (3d Cir.1999), lends additional support to a determination that the mandatory detention provisions of § 1226(c) do not pass constitutional muster. In *Ngo,* the court held that long term detention of an alien subject to a final removal order did not violate due process provided there was a possibility of the alien's eventual removal, there were adequate and reasonable procedures to seek release pending removal, and there was an adequate factual premise for a conclusion that detention was necessary to prevent a risk of flight or threat to the community. *Id.* at 397. If an alien who is subject to a final removal order is entitled to an opportunity to seek release pending execution of the removal order, then an alien who is not yet subject to a final removal order should be accorded the same opportunity. As explained by Judge Katz in *Bouayad:*

As the Third Circuit recognized in *Chi Thon Ngo,* due process demands an underlying justification for the detention of aliens. The petitioner in *Chi Thon Ngo* was an alien whose order of removal was final but who was still detained in the United States because his native country, Vietnam, refused to accept him. The court emphasized the need for an individualized evaluation of the petitioner's detention: "The process due even to deportable and excludable aliens requires an opportunity for an evaluation of the individual's current threat to the community and his risk of flight."

* * *

The interest affected by the mandatory detention provisions is not whether an alien may remain in this country, but whether the alien must be automatically detained while removal proceedings are pending. The Third Circuit's holding in *Chi Thon Ngo* clarifies that the issue of removability is distinguishable from the issue of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

detention. In *Chi Thon Ngo*, the petitioner was under a final order of removal; there was no question that he would have to leave this country when and if Vietnam agreed to accept him. However, the court found that due process still necessitated meaningful periodic reviews of the reasons for the petitioner's continued detention-- namely whether he presented a risk of flight or a danger to the community.

Admittedly, the petitioner in *Chi Thon Ngo* was unable to return to Vietnam and so could not simply end his detention by leaving this country .... However, where, as here, a petitioner contests whether he is removable under 8 U.S.C. § 1227, the option of ending detention by departing this country does not cure any constitutionality infirmity in the mandatory detention provisions. To hold otherwise would be to put the cart before the horse by requiring an alien who is subject to mandatory detention and not yet under a final order of removal to forego any challenges to the removal proceeding in order to secure his or her liberty.

74 F.Supp.2d at 475, 476.

In this case, Chukwuezi is pursuing a challenge to the fact of removability. He has been detained for approximately one year as a consequence of his challenge to removability. While it may be that he should not be released while he pursues his challenges, either because of factors such as the nature of his conviction or evidence that he poses a flight risk or danger to some person or the community, he should be afforded an opportunity to seek his release. Because § 1226(c) denies Chukwuezi such an opportunity, it is unconstitutional. Accordingly, Chukwuezi is entitled to be released unless the INS affords him a meaningful opportunity to be heard on the question of his release pending the outcome of the removal proceedings. [FN5] An appropriate Order is attached. [FN6]

> FN5. Respondent is reminded of the admonition in *Ngo*, 192 F.3d at 398, and *Bouayad*, 74 F.Supp.2d at 477, that "grudging and perfunctory review is not enough to satisfy the due process right to liberty, even for aliens."

> FN6. In light of this decision, there is no need to rule on Chukwuezi's pending motions for a temporary restraining order and for appointment of counsel.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works